JJ England
Derrick Braaten (admitted *pro hac vice*)
BRAATEN LAW FIRM
109 North 4th Street, Suite 100
Bismarck, ND 58501
Telephone: 701-221-2911
Fax: 701-221-5842
jj@braatenlawfirm.com
derrick@braatenlawfirm.com

Matthew J. Kelly
E. Lars Phillips
TARLOW, STONECIPHER, WEAMER, & KELLY, PLLC
1705 West College St.
Bozeman, MT 59715
Telephone: 406-586-9714
Fax: 406-586-9720
mkelly@lawmt.com
lphillips@lawmt.com
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
BILLINGS DIVISION

| | | |
|---|---|---|
| GIACOMETTO RANCH INC., a Montana Corporation, JOHN THOMAS GIACOMETTO, a/k/a Tom Giacometto, a resident of Montana, and ROBERT GIACOMETTO, a resident of South Dakota, | ) ) ) ) ) ) ) | Case No. 1:16-cv-00145 |
| Plaintiffs, | ) ) | THIRD AMENDED COMPLAINT |
| v. | ) ) | |
| DENBURY ONSHORE LLC, a Delaware Corporation, and DENBURY OPERATING COMPANY, a Delaware Corporation, | ) ) ) ) | |
| Defendants. | ) | |

1

## I.  <u>INTRODUCTION</u>

1.      This is an action for declaratory relief, damages, and equitable relief arising from Defendants' violation of the Montana Surface Owner Damage and Disruption Compensation Act, breach of contract, illegality of contract, trespass, unlawful occupation of property, nuisance, strict liability, unjust enrichment, mesne profits, and negligence related to oil drilling and production operations on Plaintiffs' land.

## II.  <u>PARTIES</u>

2.      Plaintiff John Thomas Giacometto ("Tom Giacometto") is a resident of Powder River County, Montana. Plaintiff Robert Giacometto is a resident of Rapid City, South Dakota. Plaintiff Giacometto Ranch Inc. is a Montana corporation in good standing, incorporated in 1975, with principal place of business in Powder River County, Montana, and whose registered agent is Tom Giacometto, 1647 Ranch Creek Road, Broadus, MT 59317.

3.      Defendant Denbury Onshore, LLC, is a Delaware limited liability company authorized to do business in the state of Montana. Denbury Onshore, LLC's principal place of business is 5320 Legacy Drive, Plano, TX 75024 and its registered agent in Montana is CT Corporation System, 3011 American Way, Missoula, MT 59808.

4.      Defendant Denbury Operating Company is a Delaware corporation authorized to do business in the state of Montana. Denbury Operating Company's

2

principal place of business is 5320 Legacy Drive, Plano, TX 75024 and its registered agent in Montana is CT Corporation System, 3011 American Way, Missoula, MT 59808.

5.      Defendants Denbury Onshore, LLC and Denbury Operating Company (collectively referred to as "Denbury") are engaged in oil and gas development in Powder River County, Montana, on and near Plaintiffs' land.

## III.   JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff Tom Giacometto is a resident of Powder River County, Montana, and Plaintiff Giacometto Ranch Inc. is a business incorporated in Montana. Plaintiff Robert Giacometto is a resident of Rapid City, South Dakota. Both defendants are businesses incorporated in Delaware, with principal places of business in Texas. The amount in controversy exceeds $75,000.00.

7.      Venue is proper in the District of Montana under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred on the Giacometto Ranch property, located in Powder River County, Montana.

## IV.   FACTUAL ALLEGATIONS

## A.   Land Ownership and Contracts

8.      Giacometto Ranch Inc. ("Giacometto Ranch") owns nearly 20,000 deeded acres in Powder River County, Montana near Belle Creek. Giacometto Ranch

Inc. is owned by Tom Giacometto and Robert Giacometto (collectively "Giacomettos"). Giacometto Ranch Inc. is also owned by the estate of Lawrence Giacometto. Tom Giacometto is involved in the ranch's day-to-day operations. Tom Giacometto lives on this ranch—some of which is original family homestead land—raising cattle, and farming alfalfa, winter wheat and other crops to support the ranch as his ancestors did before him. There are other, smaller parcels within the 20,000 acres owned by Giacometto Ranch that are owned by Tom Giacometto.

9.      A description of lands owned by Giacometto Ranch Inc. and Tom Giacometto (referred to as the "Giacometto Property" or "Subject Property") is attached as Exhibit 1.

10.      On October 17, 1966, John and Catherine Giacometto (referred to as "John and Catherine") entered into an Oil and Gas Lease with Samuel Gary (Denbury's predecessor in interest). John and Catherine are predecessors in interest to the Plaintiffs. This lease is attached as Exhibit 2, and covered 3,040 acres of land owned by John and Catherine in Sections 2, 3, 4, 8, 9, 10, 11, 15, 17, 20, 21, 22, 23, and 27 of Township 8 South, Range 54 East, Powder River County, Montana.

11.      Also on October 17, 1966, Leo and Kathryn Giacometto (referred to as "Leo and Kathryn") entered into an Oil and Gas Lease with Gary. Leo and Kathryn are predecessors in interest to the Plaintiffs. This lease is attached as Exhibit 3, and covered 960 acres of land owned by Leo and Kathryn in Sections 8, 9, 10, 11, 15, and 17 of Township 8 South, Range 54 East, Powder River County, Montana.

12.    On June 15, 1967, John and Catherine executed an Amendment to Oil and Gas Lease amending the lease they had entered into with Gary. A copy of this Amendment is attached as Exhibit 4. This amendment added an additional 80 acres in Section 10 of Township 8 South, Range 54 East, Powder River County, Montana, to the leased acreage.

13.    On August 23, 1967, John and Catherine executed an Agreement with Gary covering lands they owned in Sections 1- 4, 8-12, 15-17, 20-23, and 27 of Township 8 South, Range 54 East, Powder River County, Montana. The Agreement allowed Gary to use the surface of the described property (some of which was not leased by Gary at the time). This Agreement is attached as Exhibit 5 and is referred to as the Gary Agreement.

14.    The Gary Agreement contained specific provisions concerning damages caused by Gary to specific lands owned by John and Catherine. Specifically, the Gary Agreement stated that, in exchange for $500, John and Catherine would release Gary from all claims for damages "which have been sustained as the result of the operations of Gary." Exh. 5, at 2.

15.    Further, the Gary Agreement provided that for each and every subsequent well drilled by Gary on the lands described in the Gary Agreement (other than the No. 23-1 Giacometto well in Section 23, Township 8 South, Range 54 East, Powder River County, Montana), Gary would pay $300 to John and Catherine in exchange for a release of all damages "to the surface of said lands . . . occasioned by

5

the drilling, completing, equipping, and operating of any such well or wells." Exh. 5, at 2.

16.     Finally, the Gary Agreement granted Gary the right to use the described property for "roads, rights-of-way, pipelines, tank batteries, power and telephone lines, [and] other facilities and equipment of whatsoever nature necessary in connection with Gary's oil and gas operations upon the premises," and stated that John and Catherine acknowledged that the receipt of the payments contemplated by the Gary Agreement constituted full and completed consideration for Gary's allowed use of the property and any damages stemming from that use.

17.     On July 2, 1968, John and Catherine granted an Easement Agreement to Husky Oil Company ("Husky"). This Easement Agreement is referred to as the Husky Agreement and is attached as Exhibit 6.

18.     The Husky Agreement grants Husky Oil the "right to construct, use, and maintain such roads, not exceeding twenty five feet (25') in width as Husky may desire for its oil and gas operations." Additionally, the Husky Agreement granted Husky Oil the "right to construct, install, use, and maintain flow lines, tank, batteries, manifold systems, gathering lines, piplines [sic], treating facilities, and other oil field installations upon the subject lands." Exh. 6, at 1.

19.     Further, the Husky Agreement contained the following language pertaining to damages: "It is agreed by the parties hereto that all monies which have been paid or will be paid by Husky for drill sites, location damages, and easements

6

relating to producing wells now or subsequently located on the subject premises, shall be credited to the rentals required to be paid by Husky under this agreement. However, Husky will still pay in advance for sites upon which production is hereafter obtained." Exh. 6, at 1-2.

20.    On September 12, 1979, John and Catherine entered into an Agreement with Gary Energy Corporation ("Gary Energy"). This Agreement is attached as Exhibit 7 and relates to a proposed pipeline between "Unit 'D' wells #6-14 [in Section 6 of Township 9 South, Range 54 East, Powder River County, Montana] and 6-15 [also in Section 6 of Township 9 South, Range 54 East, Powder River County, Montana]."

21.    On December 20, 1991, the Bell Creek Consolidated (Muddy) Unit Agreement was approved by the Bureau of Land management, United States Department of Interior. This agreement is referred to as the Unit Agreement and is attached as Exhibit 8.

22.    The Unit Agreement covers lands owned by the Plaintiffs and does not contain a reference to pore space.

23.    On May 13, 2002, John and Catherine entered into an agreement with Encore Operating, L.P. ("Encore") covering all lands owned by John and Catherine in Townships 7 and 8 South, Range 54 East, Powder River County, Montana. This agreement is referred to as the "Encore Agreement" and is attached as Exhibit 9.

24.    The Encore Agreement contained specific provisions as to damages and

stated "Damage claims will be assessed on an individual basis and payments tendered separately from [the annual payment due to John and Catherine]. Also as stated in the Agreement, damage payment amounts, tendered during the annual period being assessed, will be credited towards the upcoming rental payment." Id. at 1.

25.    Between April 2012 and October 2015, Denbury and Plaintiffs entered into at least twenty-one agreements purporting to release Denbury of certain liabilities for damages caused by specific acts in exchange for one-time payments and, in at least ten separate instances, Denbury's agreement stated that the "disturbed land will be restored and reseeded as weather and ground conditions permit."

26.    The release agreements referenced in Paragraph 25 that contain affirmative statements illustrating Denbury's agreement to restore and reseed the impacted areas are individual contractual obligations to which Denbury is bound.

**B.    Oilfield Waste Equipment, Abandoned Wells, Abandoned Roads, and Fences**

27.    Denbury is the current operator of the oil and gas wells and oil and gas production equipment/infrastructure on the Giacometto property.

28.    As current operator, Denbury assumed any liability incurred by previous operators on the Plaintiffs' property.

29.    Denbury has left oil tanks, unused equipment, trash, and other junk ("oilfield waste equipment") related to oil operations strewn across the property.

30.     This oilfield waste equipment includes tanks, well plugs, useless electrical infrastructure including power poles and lines, unmarked pipes and metal objects protruding from the ground in open pasture, and huts/shacks. Much of this equipment is falling apart and rusting.

31.     Denbury's un-electrified power lines/poles on the property are not reasonably necessary to oilfield operations on the property.

32.     Denbury's tanks on the property that have sat unused by Denbury for years are not reasonably necessary to oilfield operations on the property.

33.     Denbury's unmarked pipes and metal objects protruding from the ground in the Giacomettos' open pasture are not reasonably necessary to oilfield operations on the property.

34.     Denbury's huts/shacks on the Giacomettos' property that have sat unused for years are not reasonably necessary to oilfield operations on the property.

35.     Denbury has failed to remove and reclaim what appear to be tank battery sites or old water flooding sites, and has failed to remediate contamination in these areas.

36.     Denbury's trash and junk on the Giacomettos' property that has sat unused for years are not reasonably necessary to oilfield operations on the property.

37.     This oilfield waste equipment poses a safety hazard to the Giacomettos, their hired hands, visitors to the Giacomettos' property, and their livestock.

38.     To date, Denbury has not removed this oilfield waste equipment from

the Giacomettos' property.

39.    Denbury has, on numerous occasions, left small openings in fences surrounding its oilfield shacks large enough for cattle to enter. These locations are dangerous to the Giacomettos' cattle, because once the cattle enter, they are often unable to leave the location without assistance.

40.    The Giacomettos have complained to Denbury about the fences around its oilfield shacks.

41.    Denbury has not fixed all of the fencing around its oilfield shacks.

42.    These dangerous fences disrupt the Giacomettos' ranching operations and have caused damage to the Giacomettos' ranching business.

43.    Denbury has abandoned at least two roads on the Giacometto property and has not reclaimed these roads. An example of one of these abandoned roads is located near well site 56-08. A second abandoned road is located near well sites 23-05 and 23-12.

44.    Tom Giacometto asked Kevin Anderson, Denbury's representative to the Giacometto Ranch, to reclaim certain roads on the Plaintiffs' property.

45.    Kevin Anderson responded to requests to reclaim the roads with the following response: "they are part of the infrastructure."

46.    Denbury's abandoned roads on the Giacometto Ranch are not reasonably necessary to oil and gas production operations on the Giacomettos' property.

47.     When Denbury became an operator on the Giacometto property, it promised the Giacomettos that it would clean up the mess on the property and be a responsible operator. Denbury has failed to keep that promise.

**C.     Harm caused by the Minnelusa 4 well**

48.     The Minnelusa 4 site, developed in 2014, represents a serious failure of judgment by Denbury.

49.     The Minnelusa 4 is an injection well for production waste fluid.

50.     The Minnelusa 4 was constructed on a forested hillside on the Plaintiffs' property.

51.     The Plaintiffs strenuously objected to the construction of the Minnelusa 4.

52.     The Plaintiffs' property includes a water reservoir in a valley immediately below the Minnelusa 4 location.

53.     The hillside on which the Minnelusa 4 is located naturally drains into the reservoir referenced in paragraph 52.

54.     To construct the Minnelusa 4, Denbury cleared, leveled, and graded approximately 4.66 acres of the forested hillside surrounding the final well location.

55.     Denbury estimated that construction of the Minnelusa 4 downed 620 trees/acre, for a total of approximately 2,889 trees.

56.     The trees referenced in paragraph 55 consisted of a mature, fully stocked stand of healthy ponderosa pine, and also included lesser quantities of other

11

trees and understory.

57.    Denbury stockpiled at least fifty marketable dimension trees from this location and left the trees to rot.

58.    Denbury also cut an ineffective new drainage into the hillside on which the Minnelusa 4 is located.

59.    Because of construction of the Minnelusa 4 site, the Giacomettos' reservoir has dried up.

60.    Denbury allowed water and other erosive material to flow off of the Minnelusa 4 site, down the hillside, and into the reservoir located below.

61.    None of the damage caused by Minnelusa 4 was necessary.

62.    A nearby abandoned well site existed that could have been converted into a saltwater disposal well instead of Denbury constructing the Minnelusa 4.

63.    Denbury offered the Plaintiffs only $1,700/acre for the damage from the Minnelusa 4.

64.    To date, Denbury has provided no compensation for the actual damage it caused at the Minnelusa 4 site.

**D.    Spills caused by Denbury**

65.    On or about September 2, 2016, Denbury spilled 47,880 gallons of produced water and 20 gallons of oil on the Plaintiffs' property ("September 2 spill").

66.     The September 2 spill occurred between 500 and 1,000 feet from Tom Giacometto's house and drinking water wells.

67.     The September 2 spill was caused by a rupture in the Minnelusa 3 flowline.

68.     Less than 10% of the fluid from the September 2 spill was recovered.

69.     The September 2 spill impacted Wright Creek.

70.     The September 2 spill flowed directly down Wright Creek.

71.     The September 2 spill damaged the surface of the Plaintiffs' property.

72.     The September 2 spill damaged the water resources on the Plaintiffs' property.

73.     Plaintiffs fear that their domestic water supply may become unusable due to the September 2 spill.

74.     On or about July 12, 2016, Denbury spilled 1,260 gallons of produced water and 84 gallons of oil on the Giacomettos' property near well location 15-03 (hereafter "July 12 spill").

75.     None of the fluid from the July 12, 2016 spill was recovered.

76.     The July 12 spill damaged the surface of the Plaintiffs' property.

77.     The July 12 spill damaged the water resources on the Plaintiffs' property.

78.    On or about November 12, 2015, Denbury spilled 162 gallons of produced water and 42 gallons of oil on the Giacomettos' property near well location 29-08 (hereafter "November 12 spill").

79.    The November 12 spill was caused by a tank overflow.

80.    None of the fluid from the November 12 spill was recovered.

81.    The November 12 spill damaged the surface of the Plaintiffs' property.

82.    The November 12 spill damaged the water resources on the Plaintiffs' property.

83.    On or about December 6, 2018, Denbury spilled crude oil and produced water at the Minnelusa 3 location (hereafter "December 6 spill").

84.    The December 6 spill was caused by a tank overflow.

85.    Denbury left standing spilled liquid from the December 6 spill at the Minnelusa 3 well site until at least December 10, 2018 and did not clean up the spilled liquid during this time.

86.    The Minnelusa 3 location does not have a pit liner, and one of the tanks at this location lacks a berm.

87.    The December 6 spill damaged the surface of the Plaintiffs' property.

88.    On or about March 7, 2019, Denbury spilled green fluid onto the ground at the Minnelusa 3 location causing damage to the surface of the Giacomettos' property (hereafter "March 7 spill").

89.     Apart from the September 2, July 12, November 12 spill, December 6 spill, and the March 7 spill, Denbury has had no less than thirteen additional spills and leaks on the Giacomettos' property since it became an operator on this property. Collectively, these eighteen incidents in total include $CO_2$ leaks, oil spills, and produced water spills.

90.     Of these eighteen incidents, at least twelve were caused by flow-line breaks or ruptures.

91.     Further, between March 10, 2011 and the present, Denbury has reported at least 80 different releases on or near lands owned by the Plaintiffs to the Montana Department of Environmental Quality.

92.     This averages out to Denbury reporting a release of contaminants on or near land owned by the Plaintiffs almost once a month.

93.     The releases referenced in paragraphs 65-88 have resulted in damages that are continuing in nature.

**E.     <u>Erosion damage</u>**

94.     Denbury is responsible for, and has failed to reclaim, erosion near well-site 32-05. This erosion has cut a channel through the property, making the property impassable.

95.     Denbury is responsible for, and has failed to reclaim, erosion near well site 31-09. This erosion has damaged the property's surface, rendering the ground bare and unproductive.

96.     Denbury is responsible for, and has failed to reclaim, erosion and associated dirt piles near well sites 16-09 and 16-09PA. This erosion has caused damage to the property's surface and has rendered pasture less productive in this location.

97.     Denbury is responsible for, and has failed to reclaim, erosion adjacent to well site 16-16 and the associated entrance road. This erosion has caused a deep cut in the property, causing damage to the property.

98.     Denbury is responsible for, and has failed to reclaim, erosion near the Minnelusa 2 (formerly Madison 2) well. This erosion has caused damage to the surface of the property and has rendered the pasture less productive in this location.

99.     Denbury is responsible for, and has failed to reclaim, erosion on and adjacent to well pad 15-06. This erosion has caused damage to the surface of the property, rendering pasture less productive in this location. It has also caused sediment to wash into surface waters below this well location. After repeated requests from the Giacomettos to fix this issue, this problem has not been resolved.

100.   Denbury is responsible for, and has failed to reclaim, erosion on and adjacent to the Madison 3 well pad. This erosion has caused damage to the property's surface and has rendered pasture less productive in this location.

F.   **Weeds**

101.   Denbury's operations have introduced weeds onto the Giacomettos' property.

102.   Denbury introduced thistle to well sites 15-06 and Minnelusa 4. This land was previously pristine land, and this thistle has caused damage to the Giacomettos' business and property.

103.   Denbury's operations have introduced kochia weed onto the property along its lease roads. Denbury also introduced a two acre stand of kochia weed in the Giacomettos' alfalfa field near a location commonly known as test site #1. This weed introduction has caused damage to the Giacomettos' business and property.

104.   In May of 2016, Denbury allowed a contractor to spray sterilant on the Giacomettos' property to control weeds.

105.   The sterilant sprayed in May 2016 permanently killed productive grasses adjacent to the Minnelusa 4 site and Test Site 1.

106.   The ground kill referenced in paragraph 105 caused damage to the Plaintiffs' property.

107.   Additionally, Denbury also allowed a contractor to spray sterilant on the Giacomettos' property to control weeds at other locations. This sterilant permanently killed productive grasses at the following locations as well: well 32-01, well 33-03, well 33-12, well 33-13, well 33-15. This ground kill caused damage to the Plaintiffs' property.

**G.**   **Injection of Carbon Dioxide and use of pore space**

108.   Denbury has begun injecting carbon dioxide into the Bell Creek field.

109.   Upon information and belief, Denbury profits from the injection of carbon dioxide into the Bell Creek field.

110.   Denbury's injection of carbon dioxide makes use of and possesses the subsurface "Pore Space" underneath the Plaintiffs' property.

111.   In Montana, Pore Space has been defined as "non-mineral material" that is subterranean in nature.

112.   None of the agreements between the Plaintiffs predecessors in interest or Denbury's predecessors in interest reference pore space.

113.   The pore space beneath the Plaintiffs' property is owned by the Plaintiffs.

114.   By injecting carbon dioxide into the Bell Creek field, Denbury has permanently and exclusively utilized and possessed the pore space belonging to Plaintiffs. While Denbury has the limited right to use this pore space for  oil production, Denbury's use of this pore space is exclusive and permanent and exceeds

18

the scope of any implied easement. Denbury does not have the legal right to permanently and exclusively use the Giacomettos' pore space.

115.   Because the pore space belongs to Plaintiffs and Denbury does not have the right to permanently and exclusively utilize the pore space, Denbury has exercised wrongful possession over property owned by the Plaintiffs, is trespassing on property owned by the Plaintiffs, and has been unjustly enriched from the use of property that belongs to the Plaintiffs.

**H.**   **Unauthorized access by third parties for research**

116.   Denbury stores at least an estimated 1.1 million tons of $CO_2$ annually in the pore space of the Bell Creek Field within a sandstone reservoir. This sandstone reservoir is at a depth of approximately 4,500 feet. At the end of Denbury's oil production operations, Denbury will store at least 12.7 million tons of $CO_2$ in this pore space. As of July 31, 2018, Denbury has stored at least an estimated 5.94 million tons of $CO_2$ of 98% purity into the Bell Creek Field, resulting in storage of at least 5.87 million tons of this $CO_2$.

117.   Because the Giacometto Ranch, Inc. overlays much of Bell Creek Field, much of this $CO_2$ storage is within Giacometto Ranch, Inc. pore space.

118.   This pressurized $CO_2$ perpetually uses and occupies the Giacomettos' pore space.

119.   The United States Department of Energy ("USDOE") is funding millions of dollars of $CO_2$ research on the Giacomettos' land related to Denbury's

carbon sequestration. The Giacomettos have not given permission for this research to occur. Substantial sums of money are first awarded by USDOE to the University of North Dakota's ("UND") Energy & Environmental Research Center ("EERC") via grants and contracts. EERC then subcontracts much of this work to Denbury or enters into contracts with Denbury as EERC's "vendor" to complete this work. The scope and scale of EERC's research in the Bell Creek Field and upon the Giacometto Ranch is extensive.

120.   Denbury and its research partners are developing critical pieces of intellectual property by obtaining the "knowledge needed" to learn how to sequester $CO_2$, track the $CO_2$, and ultimately account for $CO_2$'s fate, with the goal of creating a replicable formula that can be used in other areas to ensure that $CO_2$ is sequestered. To this end, EERC has developed scores of deliverables for USDOE based upon research conducted in the Bell Creek Field involving Giacometto Ranch's pore space. EERC has restricted access to this information by creating a "Partners Only" web-portal that contains an "Interactive Geographic Information Systems Map" and "over 600 reports, presentations, and outreach materials." The majority of these "600" documents involve the Bell Creek Field, which the Giacomettos learned only after filing an open records request with EERC for the materials on the Partners Only page. Most of those research papers explicitly indicate that they were produced with USDOE money and in partnership with Denbury. EERC has deemed some of this information proprietary and confidential and therefore would not provide it in

response to an open records request.

121.   Denbury has various subcontractor and vendor agreements between EERC and Denbury.  Each of these agreements indicates that the contract is for "U.S. Department of Energy Fossil Energy Research and Development" and each agreement states either that it is a "subcontract" or a "vendor agreement." Together, these agreements provide monetary consideration totaling at least $10,067,678.00.

122.   One contract contains a sum of $24,100 and indicates that its purpose is "[p]rocuring legal access for the University of North Dakota Energy & Environmental Research Center (EERC) to conduct [an experimental method of] seismic testing … for detecting CO2 plume."

123.   A second contract is a $612,020 "subcontract." That contract indicates that part of its purpose is to conduct a "K-Wave Study and 3-D Seismic Acquisition." Once again, this subcontract states that Denbury will provide EERC with "reasonable access" to the wells where this testing will take place. This work was completed partly on Giacometto Ranch property.

124.   A third contract is a $1,713,425 "vendor agreement" between Denbury and EERC.

125.   A fourth contract subsumes the work contained in Contract 3, and then adds seven additional tasks. The total dollar value of this "vendor agreement" between EERC and Denbury is $9,343,158.

126.   A fifth contract is an $88,400 "subcontract." The purpose of this

subcontract is to conduct "geophysical field test efforts related to CO2 Injection Monitoring with an Optimized Scalable Automated Semipermanent Seismic Array (SASSA 2.0)." This particular contract resulted in EERC employees spreading wires, geophones, and equipment across Giacometto Ranch without its consent.

127.   In addition to EERC and PCOR, USDOE has also directly paid the Colorado School of Mines $1,256,895.00 to conduct imaging of CO2 within the Giacometto Ranch's pore space. This particular contract resulted in USDOE employees and Colorado School of Mines employees entering the Giacometto Ranch in 2018, spreading wires across portions of the ranch, and conducting testing without the Giacomettos' permission. Tom Giacometto verbally warned these employees that they were trespassing, but they remained onsite because Denbury stated that these employees had the right to be on the property. On multiple occasions, USDOE and EERC employees have similarly entered Giacometto Ranch property without permission of Giacometto Ranch. These USDOE and EERC employees have indicated that they were invited onto Giacometto Ranch by Denbury. EERC has posted a detailed video of its work in the Bell Creek Field directly on EERC's website. Much of that video depicts the Giacomettos' ranch. The video is titled "The Bell Creek Story," and is available at https://undeerc.org/pcor/Documentary/Bell-Creek-Story.aspx.

128.   The bottom line is that the Giacomettos' property, and particularly the pore space, is being used as a carbon sequestration federal research laboratory. The

Giacomettos are not getting a dime in compensation for this valuable use of their property and have never given permission for this research. Instead, Denbury is inviting federal employees and university researchers onto the Giacomettos' property, and Denbury is getting paid for providing that access even though Denbury lacks the legal right to do so.

## I.    <u>Illegal operation of the Minnelusa 3</u>

129.   The Minnelusa 3 SWD (API 25-075-21941-00-00) ("Minnelusa 3"), formerly known as the Madison 3, was permitted on December 10, 1971, spudded and completed in March 1972. The Minnelusa 3 was originally a water supply well intended to draw water from the Madison Formation.

130.   The Minnelusa 3 was completed to a total depth of approximately 7,353 feet below the surface. The well's surface casing was set at 278 feet.

131.   In 2014, Denbury converted the Minnelusa 3 from a water supply well to a produced water injection well that would inject water into the Minnelusa formation. To that end, Denbury applied for and was issued an underground injection control (UIC) permit (MT5347) with a maximum allowable injection pressure of 1,855 pounds per square inch (psi). Denbury also obtained an exemption from the United States Protection Agency to inject produced water into the Minnelusa formation, which itself is an underground source of drinking water.

132.   Underground sources of drinking water exist at other depths as well, including within the Pierre Shale, the base of which is approximately 717 feet below

the surface.

133.   Denbury did not install a surface casing sufficient to protect the freshwater aquifers underlying the Giacometto ranch.

134.   The Minnelusa 3 began injecting in September 2014 and continued through March 2016. Denbury reported no injection volumes between March 2016 and January 2019, and the volumes reported after January 2019 were only reported after Plaintiffs submitted a complaint to the Montana Board of Oil and Gas ("MBOG") that Denbury was failing to report injections.

135.   Denbury injected during the times it reported no injection of produced water. Denbury illegally submitted false and fraudulent reports to MTBOG regarding injection activities at the Minnelusa 3.

136.   After the Plaintiffs alerted MBOG to the unlawful injections at the Minnelusa 3, MBOG ordered Denbury to complete a mechanical integrity test for the Minnelusa 3. On March 30, 2020, the Minnelusa 3 failed this Mechanical Integrity Test ("MIT").

137.   On information and belief, there is a leak in the casing of the Minnelusa 3, and it has existed for months, and possibly years.

138.   Denbury injected produced water and other fluids down the Minnelusa 3 during the time this casing had had a leak in it.

139.   Denbury injected waste illegally down the Minnelusa 3 by injecting substances that are prohibited by law, including during the time this casing had had

24

a leak in it.

140.   Denbury injected waste down the Minnelusa 3 that is non-exempt hazardous waste under the Resource Conservation and Recovery Act in violation of state and federal law, including during the time this casing had had a leak in it.

141.   Denbury operated the Minnelusa 3 in violation of Montana law, and without the knowledge of the MTBOG from 2016 to around March of 2020.

142.   Denbury illegally failed to report injection volumes and other data to the MTBOG as required by law.

143.   In other words, Denbury has operated the Minnelusa 3 as a fly-by-night dumpsite for illegal waste and intentionally hid activity at the Minnelusa 3 from state regulators.

144.   Pending further testing, and on information and belief, Denbury's illegal operations at the Minnelusa 3, both as a result of surface spills and the casing leak, have contaminated groundwater on and under the Giacometto property.

145.   Denbury used the Minnelusa 3 illegally and with malice toward the Giacomettos.

**J.   Actual malice**

146.   Denbury has acted with actual malice towards Plaintiffs, and Plaintiffs are entitled to punitive damages.

147.   Denbury has knowledge of the following:

    i.        the boundaries of the Giacomettos' property;

  ii.   the surface use agreements that allow Denbury to use the Giacomettos' property; and

  iii.   the scope of the surface use agreements that allow Denbury to use the Giacomettos' property;

148. With knowledge of the facts stated in the foregoing paragraph, Denbury deliberately engaged in the following conscious and intentional acts:

  i.   Denbury utilized areas of the Giacomettos' property that are outside the scope of the surface use agreements that allow Denbury to use the Giacomettos property.

  ii.   Denbury utilized areas of the Giacomettos' property for purposes that are inconsistent with, and not contemplated by, the surface use agreements that allow Denbury to use the Giacomettos property.

149. With knowledge of the facts alleged in this Complaint, Denbury proceeded to engage in acts that have injured Plaintiffs with deliberate indifference to the high probability of injury to the Plaintiffs.

150. Denbury acted with actual malice towards the Plaintiffs by intentionally disregarding, and exhibiting a deliberate indifference to, their property interests.

151. Denbury has acted with actual malice toward the Plaintiffs with regards to spills and releases on the Giacomettos property. Denbury had actual knowledge that its flow-lines were defective and dangerous based upon the pattern of line

ruptures and breaks on the Giacometto property. Denbury intentionally disregarded the high probability of injury to the Giacomettos and continued operating these defective lines. This culminated in the September 2 spill, discussed above, which has now impacted a creek, threatens the Giacomettos' drinking water, and has disrupted the Giacomettos' repose at their nearby home.

## V.   CLAIMS

**CLAIM NO. 1:   DAMAGES UNDER MONTANA SURFACE OWNER DAMAGE AND DISRUPTION COMPENSATION ACT (SODDCA), MCA §§ 82-10-504, 82-10-505**

152.   Plaintiffs reallege all preceding paragraphs in this Complaint.

153.   MCA § 82-10-504 states that "[t]he oil and gas developer or operator shall pay the surface owner a sum of money or other compensation equal to the amount of damages sustained by the surface owner for loss of agricultural production and income, lost land value, and lost value of improvements caused by oil and gas operations."

154.   MCA § 82-10-505 states that "[t]he oil and gas developer or operator is responsible for damages to real or personal property caused by oil and gas operations and production."

155.   As required by MCA § 82-10-506, the Giacomettos gave Denbury "written notice" of their initial assessments of their damages, including the following:

    i.   Minnelusa 4 site disturbance: $25,000;

    ii.   Minnelusa 4 site annual rental: $2,750/year;

    iii.   Minnelusa 4 site, marketable trees removed: $121,250;

    iv.   Minnelusa 4 site, smaller trees removed: $150,000;

    v.   Lost alfalfa production due to failed reclamation of field near test site 1: $400;

    vi.   Annual damage payments for roads constructed on the Giacomettos' property: $3/rod;

    vii.   Attorney's fees for negotiation of reasonable compensation: $250/hour.

156.   The damages for the Minnelusa 4 site amount to at least $301,750.

157.   In response to the Giacomettos' letter, Denbury claimed that it was only obligated to pay an amount stated in the Husky Agreement: $100/year for each producing well. Therefore, Denbury refused to provide actual, adequate compensation in response to the Giacomettos' letter.

158.   As required by MCA § 82-10-506, on October 24, 2016, the Giacomettos also gave Denbury "written notice" of their initial assessments of damage to the reservoir below the Minnelusa 4 location caused by construction and operation of the Minnelusa 4 well. More than sixty days have passed since serving this notice.

159.   As required by MCA § 82-10-506, on October 24, 2016, the

Giacomettos also gave Denbury "written notice" of their initial assessments of damages caused by the September 2 spill. More than sixty days have passed since serving this notice.

160.   MCA § 82-10-508 states that "[i]f the person seeking compensation receives a written rejection, rejects the offer of the oil and gas developer or operator, or receives no reply, that person may bring an action for compensation." The Giacomettos received a written letter of rejection from Denbury, and the Giacomettos further reject any offer made by Denbury to the extent that such an offer was made.

161.   Denbury to date has not provided actual compensation for the damage to the Giacomettos' property described in Paragraphs 48-73. Plaintiffs affirmatively allege that Denbury is liable for these damages pursuant to MCA § 82-10-504 and MCA § 82-10-505.

**CLAIM NO. 2:     VIOLATION OF SODDCA, MCA § 82-10-504.**

162.   Plaintiffs reallege all preceding paragraphs in this Complaint.

163.   Claim for Relief No. 2 is expressly pled in the alternative to Claim for Relief No. 3.

164. MCA § 82-10-504 requires the oil and gas operator to "attempt to negotiate in good faith an agreement on damages" for all damages arising from oil and gas operations on the surface of a property subsequent to June 1, 1981.

165. Denbury has not attempted to negotiate a good faith agreement on

damages with the Giacomettos. Instead, Denbury insists that the Husky Agreement and Gary Agreement are in effect and interprets these agreements to not require compensation for actual damages.

166.  Plaintiffs affirmatively allege that Denbury is in violation of MCA § 82-10-504, which requires it to "attempt to negotiate in good faith an agreement on damages" with the Giacomettos for all damages arising after June 1, 1981.

**CLAIM NO. 3:    BREACH OF CONTRACT – HUSKY AGREEMENT**

167.  Plaintiffs reallege all preceding paragraphs in this Complaint.

168.  Denbury is bound by the provisions of the Husky Agreement, a contract in full force and effect.

169.  The Husky Agreement requires payment of damages for "drill sites" and "location damages."

170.  These damages for "drill sites" and "location damages" are separate and distinct from the payment of $100 annually per producing well, which is compensation for use as opposed to compensation for damage.

171.  Denbury has not paid the Giacomettos actual damages for all "drill sites" and "location damages" for wells and related access roads, constructed by Denbury, on the Plaintiffs' property.

172. Because Denbury has not paid the Giacomettos for all "drill site" and "location damages" as required by the Husky agreement, Plaintiffs affirmatively

allege that Denbury is in material breach of this agreement and has caused damage to the Plaintiffs in an amount to be proved at trial.

## CLAIM NO. 4:   BREACH OF CONTRACT – RELEASE AGREEMENTS

173.  Plaintiffs reallege all preceding paragraphs in this Complaint.

174.  Plaintiffs and Denbury entered into the Release Agreements purporting to resolve damage to the Plaintiffs' property caused by Denbury.

175.  Some of the Release Agreements signed by Denbury contain a voluntary and binding agreement by Denbury that "disturbed land will be restored and reseeded as weather and ground conditions permit."

176.  Denbury's agreement to restore and reseed the impacted property was a material part of each of the relevant Release Agreements between Denbury and Plaintiffs.

177.  Denbury has not restored and reseeded the impacted property covered by the Release Agreements attached as Exhibits 10, 11, 12, and 13. Plaintiffs are still evaluating whether Denbury has complied with the requirements of the remaining Release Agreements and affirmatively allege that they may discover additional areas governed by Denbury's restoration agreements that require additional restoration.

178.  Because Denbury has not restored and reseeded some areas covered by the pertinent Release Agreements, Denbury has breached those agreements, causing damage to Plaintiffs of an amount to be proved at trial.

**CLAIM NO. 5:    BREACH OF CONTRACT – OIL AND GAS LEASE
                 DATED OCTOBER 17, 1966**

179.  Plaintiffs reallege all preceding paragraphs in this Complaint.

180.  Denbury and Plaintiffs are successors-in-interest to an Oil and Gas Lease
dated October 17, 1966.

181.  Denbury has breached the provisions of the October 1966 Lease by
failing to "pay for damages caused by its operations" as required by the Lease.

182.  Plaintiffs have been damaged by Denbury's breach of the October 1966
Lease in an amount to be proven at trial.

**CLAIM NO. 6:    VIOLATION OF MCA § 28-2-701, CONTRACT
                 ILLEGAL AND IN VIOLATION OF PUBLIC POLICY**

183.  Plaintiffs reallege all preceding paragraphs in this Complaint.

184.  Claim No. 6 specifically relates to the Gary Agreement.

185.  The Gary Agreement is contrary to SODDCA's express provisions,
SODDCA's purpose, and good morals, and therefore the Giacomettos affirmatively
allege that the Gary Agreement is illegal and in violation of public policy under
MCA § 28-2-701.

**CLAIM NO. 7:    TRESPASS FOR TRASH, WASTE, USELESS
                 EQUIPMENT NOT REASONABLY NECESSARY FOR
                 OIL OPERATIONS, AND SPILLS**

186.  Plaintiffs reallege all preceding paragraphs in this Complaint.

187. Denbury has left trash, waste, debris, and abandoned materials strewn throughout the Giacometto Ranch property. These materials are not reasonably necessary for oil operations, and include tanks, well plugs, unused electric infrastructure including power poles and lines, unmarked/unused pipes and metal objects protruding from the ground in open pasture, and unused huts/shacks.

188. These materials are the property of Denbury.

189. Denbury has no lawful authority to allow property to remain on the Giacometto Ranch that is not reasonably necessary for oil operations.

190. Denbury does not have the permission of the Giacomettos to allow these materials to remain on the property.

191. Denbury has intentionally left these materials on the ranch and has not removed these items.

192. Additionally, Denbury has caused numerous spills and releases of oil and oil production related contaminants on and near the Plaintiffs' property. These spills constitute a continuing and ongoing trespass to Plaintiffs' property interests.

193. The illegal operation of the Minnelusa 3 and the spills and leaks from the Minnelusa 3 constitute a trespass to the surface estate (including the pore space).

194. Plaintiffs affirmatively allege that Denbury's actions constitute trespass of a continuing and ongoing nature, and that this trespass is the actual and legal cause of damage to the Giacomettos, of an amount to be proved at trial.

**CLAIM NO. 8:    TRESPASS FOR INTENTIONAL USE OF PORE SPACE**

195.  Plaintiffs reallege all preceding paragraphs in this Complaint.

196.  Through its permanent and exclusive injection of carbon dioxide into the Bell Creek field, Denbury has utilized Plaintiffs' property, specifically the subterranean pore space owned by Plaintiffs, without legal right.

197.  Denbury's permanent and exclusive use of the subterranean pore space owned by Plaintiffs constitutes a continuing and ongoing trespass to Plaintiffs.

198.  This trespass is the actual and legal cause of damage to the Giacomettos, of an amount to be proved at trial.

**CLAIM NO. 9:    UNLAWFUL OCCUPATION OF PROPERTY (MCA § 27-1-318)**

199.  Plaintiffs reallege all preceding paragraphs in this Complaint.

200.  Denbury's trash, waste, debris, and abandoned materials constitute an unlawful occupation of the Giacomettos' property.

201.  Denbury's permanent injection of carbon dioxide into the subterranean pore space owned by the Plaintiffs is an unlawful occupation of the Plaintiffs' property.

202.  Denbury has not paid the Giacomettos for the loss of use caused by this wrongful occupation.

203.  This unlawful occupation is the actual and legal cause of damage to the Giacomettos, of an amount to be proved at trial.

**CLAIM NO. 10: NUISANCE (MCA § 27-30-103)**

204.  Plaintiffs reallege all preceding paragraphs in this Complaint.

205.  Denbury's trash, waste, debris, and abandoned materials are an obstruction to the Giacomettos' free use of their property, and they interfere with the comfortable enjoyment of their property.

206.  Denbury has also left fencing open around well sites and tank batteries (or simply not installed fencing at all) that allow cattle to enter these well sites, but makes it difficult for cattle to leave, thus disrupting the Giacomettos' ranch. This inadequate fencing is an obstruction to the Giacomettos' free use of their property, and it interferes with the Giacomettos' comfortable enjoyment of their property.

207.  Denbury has also allowed erosion to occur on the property. This erosion has created dangerous conditions on the property, rendered parts of the property impassable, and caused sediment to wash off the surface of the property, rendering the land unproductive. This erosion is an obstruction to the Giacomettos' free use of their property, and it interferes with the comfortable enjoyment of their property.

208.  Denbury has also introduced weeds onto the property, where previously there were none. These weeds are an obstruction to the Giacomettos' free use of their property, and they interfere with the comfortable enjoyment of their property.

209.  Denbury has also caused erosive material to flow into the Giacomettos' reservoir located below the Minnelusa 4 location and further caused this reservoir to dry up.

210.  Denbury's acts and omissions have also resulted in several head of cattle dying on the property, near Denbury's operations.

211. Denbury has also permanently and exclusively used the subterranean pore space underneath Plaintiffs' property.

212. Denbury has also continued to damage the Plaintiffs' property through continuous spills and releases of hazardous materials.

213. The illegal operation of the Minnelusa 3, the hole in the casing, the unsafe shallow surface casing, and the spills and leaks from the Minnelusa 3 constitute a nuisance.

214. Plaintiffs affirmatively allege that Denbury's trash, waste, debris, abandoned materials, open fences around its well sites, erosion caused by Denbury, introduction of weeds, spills and releases of hazardous materials to the Subject Property, prior and ongoing damage to the reservoir near the Minnelusa 4, operation of the Minnelusa 3 and the remaining contamination and inadequate, faulty casing, and permanent and exclusive use of Pore Space are private nuisances pursuant to MCA

215.  § 27-30-103. The Giacomettos are injuriously affected and their personal enjoyment is lessened by these nuisances. These private nuisances are the actual and legal cause of damage to the Giacomettos, of an amount to be proved at trial.

**CLAIM NO. 11: STRICT LIABILITY**

216.   Plaintiffs reallege all preceding paragraphs in this Complaint.

217. Handling, transporting, and storing oil and its byproducts, including produced water, is an abnormally dangerous activity.

218. Spraying ground sterilant on land is an abnormally dangerous activity.

219. Because handling, transporting, and storing of oil and its byproducts is an abnormally dangerous activity, Denbury is strictly liable for damage caused by these activities.

220. Because spraying ground sterilant on land is an abnormally dangerous activity, Denbury is also strictly liable for any harm caused by use of ground sterilant.

221. The September 2, July 12, November 12 spill, December 6 spill, and the March 7 spill were the result of Denbury's operations in which it handled, transported, and stored oil and its byproducts, including produced water. These spills were the actual and legal cause of damage to the Giacomettos' property, of an amount to be proved at trial.

222. Additionally, Denbury allowed its contractor to spray ground sterilant on the Giacomettos' property at the following locations: Minnelusa 4, Test Site 1, well 32-01, well 33-03, well 33-12, well 33-13, well 33-15. This sterilant permanently killed productive grasses at these locations, and was the actual and legal cause of damage to the Giacomettos' property, of an amount to be proved at trial.

223. Plaintiffs affirmatively allege that Denbury is strictly liable for the damage caused by its September 2, July 12, November 12 spill, December 6 spill,

37

and the March 7 spills and spraying of sterilant at Minnelusa 4, Test Site 1, well 32-01, well 33-03, well 33-12, well 33-13, and well 33-15.

**CLAIM NO. 12:  NEGLIGENCE**

224.  Plaintiffs reallege all preceding paragraphs in this Complaint.

225.  Claim No. 11 is pled in the alternative to Claim No. 10.

226.  Denbury owed a duty of ordinary care to the Giacomettos.

227.  Denbury caused the September 2, July 12, November 12 spill, December 6 spill, and the March 7 spills on the Giacomettos' property.

228.  Denbury breached its duty of ordinary care to the Giacomettos for each of these three spills by:

> a.    Failing to construct these facilities to properly contain produced water, oil, and chemicals;
>
> b.    Failing to install adequate failsafe systems to prevent oil, produced water, and chemical leaks;
>
> c.    Failing to keep these facilities in good repair; and
>
> d.    Failing to adequately monitor these facilities for maintenance concerns.

229. These spills were the actual and legal cause of damage to the Giacomettos' property, of an amount to be proved at trial.

230. Additionally, Denbury allowed its contractor to spray sterilant on the Giacomettos' property at the Minnelusa 4 site, Test Site 1, well 32-01, well 33-03,

well 33-12, well 33-13, and well 33-15. This sterilant permanently killed productive grasses at these locations.

231. Denbury breached its duty of care to the Giacomettos by failing to take adequate measures to ensure that these chemicals were safely applied to the Giacomettos' property.

232. Denbury's failure to take adequate measures to ensure that these chemicals were safely applied to the Giacomettos' property was the actual and legal cause of damage to the Giacometto property, of an amount to be proved at trial.

233. Additionally, Denbury breached its duty of care to the Giacomettos by operating the Minnelusa 3 in violation of law, including reporting and well integrity requirements of the Montana Board of Oil and Gas, and further by failing to take adequate measures to ensure that spills and leaks at the Minnelusa 3 did not occur. These breaches are the proximate and legal cause of damage to the Plaintiffs.

234. Plaintiffs affirmatively allege that Denbury was negligent and is therefore liable to the Giacomettos for damage caused by the operation of the Minnelusa 3 and the spills and leak in the casing, the September 2, July 2, and November 12 spills as well as damage caused by spraying of sterilant at the Minnelusa 4 site, Test Site 1, well 32-01, well 33-03, well 33-12, well 33-13, and well 33-15.

## CLAIM NO. 13: UNJUST ENRICHMENT

235. Plaintiffs reallege all preceding paragraphs in this Complaint.

236. Denbury has permanently injected carbon dioxide into the Bell Creek field.

237. Upon information and belief, Denbury has profited from the permanent injection of carbon dioxide into the Bell Creek Field and will continue to profit from this permanent injection of carbon dioxide into the Bell Creek Field.

238. Denbury has profited by selling off access and allowing access to the surface estate of the Giacometto Property (including the subsurface) to university and federal employees for carbon sequestration research and the development of related valuable intellectual property. Money received by Denbury in exchange for allowing this access includes money originating from the United States Department of Energy.

239. Denbury, through its permanent injection of carbon dioxide and selling off access to the Giacometto Ranch to study this carbon dioxide, has utilized property belonging to the Plaintiffs without legal right.

240. There is no agreement with Plaintiffs pertaining to Denbury's use of the pore space, including using the surface and subsurface of Giacometto Ranch to study the sequestered $CO_2$, to invite others to study the sequestered $CO_2$, and to develop intellectual property using the Giacomettos' the pore space.

241. Because Denbury has profited from its use of Plaintiffs' property without legal right, Denbury has been unjustly enriched through the use of said property.

## CLAIM NO. 14: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

242.  Plaintiffs reallege all preceding paragraphs in this Complaint.

243.  A special relationship exists between Plaintiffs and Denbury because Denbury is the operator of an oil and gas lease that covers the Plaintiffs' property.

244.  There are several contracts that form the basis for the special relationship between Plaintiffs and Denbury, including but not limited to:

      a.      The October 1966 Oil and Gas Lease referenced above;

      b.      The Husky Agreement; and

      c.      The Release Agreements discussed in Paragraph 25.

245.  As an interest holder in the contracts between Denbury and Plaintiffs, Denbury is required to act with honesty in fact and observe reasonable commercial standards of fair dealing in the oil and gas industry.

246.  Denbury has breached the covenants of good faith and fair dealing implied into the contracts referred above by not acting with honesty in fact and by failing to observe reasonable commercial standards of fair dealing. The facts alleged in this Complaint form the basis of the failure to observe reasonable commercial standards and failure to act with honesty in fact.

247.  Specifically, the agreements between Denbury and its predecessors-in-interest are limited in scope by the implied easement and other law to uses of the property that are "reasonably necessary" for production of the minerals, and the

scope of these agreements are also limited by the accommodation doctrine as this legal term of art is understood in the oil and gas industry, and Denbury has breached this covenant by not observing these limitations on the scope of the agreements.

248. Plaintiffs have been injured by Denbury's breach of the implied covenant of good faith and fair dealing in an amount to be proven at trial.

**CLAIM NO. 15: RESTORATION DAMAGES**

249. Plaintiffs reallege all preceding paragraphs in this Complaint.

250. Plaintiffs live, work, and operate on a family-owned commercial ranch operation.

251. Plaintiffs intend to, and will continue to, use the property for the purposes of a commercial ranch operation.

252. Plaintiffs have personal reasons that justify their intent and will to continue to use the property for a commercial ranch.

253. Plaintiffs' value in the property is noncommercial and personal.

254. Plaintiffs do not intend to sell the property.

255. Ranching, and the operation of this Ranch in particular, is a way of life for Plaintiffs, and it is intended to be passed on to their children.

256. Denbury is able to restore the damage it has done to the property to substantially the condition it was in before the injuries occurred.

257. Plaintiffs seek restoration damages from Denbury to restore the property

to its previous state.

**CLAIM NO. 16:  EJECTMENT**

258.  Plaintiffs reallege all preceding paragraphs in this Complaint.

259.

260.  Denbury is permanently and exclusively utilizing the subterranean pore space owned by the Plaintiffs without legal right.

261.  Plaintiffs have been damaged by Denbury's permanent and exclusive use of the subterranean pore space.

262.  Plaintiffs are entitled to recover damages from Denbury in the form of mesne profits in order to compensate Plaintiffs' for Denbury's use of the property without permission or legal right.

263.  Plaintiffs request a declaration from this Court that they are entitled to possession of that subterranean pore space underneath their property which is permanently and exclusively being used and possessed by Denbury.

**CLAIM NO. 17:   DAMAGES UNDER SODDCA RELATING TO PORE SPACE**

264.  Plaintiffs reallege all preceding paragraphs in this Complaint

265.  April 1, 2019, Plaintiffs sent notification informing Denbury that they have been damaged by Denbury's use of the subterranean pore space beneath Plaintiffs' property.

266.  Denbury did not make a reasonable offer of settlement in response to

this notice and to the extent that Denbury sent a proper response under SODDCA, the Giacomettos have rejected that offer under MCA § 82-10-508.

267. Plaintiffs own the subterranean pore space underneath their property.

268. The Giacomettos' pore space has value.

269. Denbury has permanently and exclusively utilized the Giacomettos' subterranean pore space.

270. Denbury's permanent and exclusive use of the Giacomettos' pore space has devalued the Giacomettos' pore space and caused damage to the Giacomettos.

271. MCA § 82-10-504 states that "[t]he oil and gas developer or operator shall pay the surface owner a sum of money or other compensation equal to the amount of damages sustained by the surface owner for loss of agricultural production and income, lost land value, and lost value of improvements caused by oil and gas operations."

272. MCA § 82-10-505 states that "[t]he oil and gas developer or operator is responsible for damages to real or personal property caused by oil and gas operations and production."

273. Denbury has not compensated the Giacomettos for the lost land value of the Giacomettos' pore space and damage that Denbury caused by permanently and exclusively using the Giacomettos' pore space.

274. The Giacomettos affirmatively allege that Denbury is liable for these damages pursuant to MCA § 82-10-504 and MCA § 82-10-505.

## VI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully requests relief from this Court as follows:

I.    COMPENSATORY DAMAGES in an amount to be proven at trial;

II.    SPECIAL RESTORATION DAMAGES, for the reasons set forth above, in an amount to be proven at trial;

III.    PUNITIVE DAMAGES in an amount to be proven at trial;

IV.    DECLARATORY relief as follows:

1.    A finding that Denbury has trespassed, and is trespassing, on Plaintiffs' property;

2.    A finding that Denbury has breached the various contracts described in Claim Nos. 3-5.

V.    RESCISSION of the Gary Agreement, modification of the Gary Agreement, or declaration that the Gary Agreement is void;

VI.    RESTITUTION;

VII.    MESNE PROFITS as a special damage item, as well as special damages to the extent required for recovery under unjust enrichment;

VIII.    INJUNCTIVE RELIEF requiring Denbury to remove the carbon dioxide from the Giacomettos' pore space that is no longer useful to oil production, and further to remove the carbon dioxide that Denbury has permanently injected into the Giacomettos' pore space;

IX.    INJUNCTIVE RELIEF requiring Denbury to remove trash, waste, abandoned equipment, and infrastructure from the Giacomettos' property that is not reasonably necessary to oil production;

X.     INJUNCTIVE RELIEF OR, ALTERNATIVELY, SPECIAL DAMAGES requiring Denbury to immediately abate all nuisances alleged in this complaint or provide the Giacomettos with sufficient damages to abate all nuisances alleged in this complaint;

XI.    SPECIFIC PERFORMANCE by Denbury of contracts requiring restoration of the Giacometto surface estate;

XI.    COSTS and reasonable attorney's fees; and

XII.   OTHER EQUITABLE RELIEF as this Court deems just.

## VII.   **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action as to all issues so triable.

Respectfully submitted,

Dated:   February 26, 2021        __/s/ JJ England_____

JJ England
Derrick Braaten (admitted *pro hac vice*)
BRAATEN LAW FIRM
*Attorneys for Plaintiffs*
109 North 4th Street, Suite 100
Bismarck, ND 58501
Telephone: 701-221-2911
Fax: 701-221-5842
jj@braatenlawfirm.com
derrick@braatenlawfirm.com

Matt Kelly
Lars Phillips
TARLOW, STONECIPHER, WEAMER, & KELLY, PLLC
*Attorneys for Plaintiffs*
1705 West College St.
Bozeman, MT 59715
Telephone: 406-586-9714
Fax: 406-586-9720
mkelly@lawmt.com
lphillips@lawmt.com